McHugh, J.
I. BACKGROUND
Resolution of the issue now before the Court requires the essentially discretionary judgment whether the contacts between the Commonwealth of Massachusetts and the facts of this case are sufficient to allow the action to proceed here or whether, notwithstanding the Court’s jurisdiction over the parties and the subject matter and the plaintiffs election to commence the action here, the case should be dismissed so that plaintiff can pursue its claims in another forum.
Plaintiff, Conagra, Inc., is a large food producer and distributor with a principal place of business in Omaha, Nebraska. Conagra’s business extends through the United States and the world. Arkwright, the defendant, is a mutual insurance company organized 150 years ago with its home office in Waltham, Massachusetts. Arkwright has regional offices located throughout the United States.
In this action, Conagra seeks to recover approximately $38 million in damages it claims to have suffered in two fires, one of which occurred in Kansas and the other of which occurred in Missouri. The Kansas fire occurred in a large underground cold storage facility in Kansas City on December 28, 1991. The Missouri fire occurred on March 16, 1992 in a cold storage facility in Marshall, Missouri. Conagra claims that it incurred damages of approximately $29 million in Kansas fire and that the Missouri fire caused $9 million in damages.
II. FACTS
At the heart of the present dispute is the question whether Conagra’s losses were covered under an insurance policy or policies Arkwright issued and whether, if the losses were covered, they were of the magnitude Conagra claims. The parties are not in *365 serious dispute about many of the facts bearing on the present motion. Instead, their dispute centers on what facts are relevant, and the weight various facts are entitled to receive, in deciding where the action should proceed. The essential facts, therefore, are as follows:
Before June 1, 1989, Conagra was insured by a group of London underwriters and Arkwright had no business relationship with Conagra whatsoever. In early 1989, however, Walter Kerr, a senior account executive in Arkwright’s Midwest regional office, had a series of discussions with Conagra representatives at Conagra’s Omaha headquarters about the possibility of Arkwright providing property insurance for Conagra. At the time, as now, Arkwright’s Midwest regional office was located in Schaumberg, Illinois, a town about 30 miles northwest of Chicago. A series of meetings and telephone conversations between Conagra and Arkwright followed Mr. Kerr’s initial overture. None of the meetings or telephone conversations took place in Massachusetts or involved Conagra employees who worked in Massachusetts although Massachusetts employees of Arkwright were kept abreast of the negotiations’ progress.
On April 21, 1989, Mr. Kerr presented Arkwright’s initial proposal for insuring Conagra to representatives of Conagra at a meeting in Schaumberg. The proposal had been approved by Arkwright officials in Massachusetts. The insurance Mr. Kerr proposed was to run for a period of five years. Three days later, by a letter Conagra sent from Omaha to Mr. Kerr in Schaumberg, Conagra accepted Mr. Kerr’s proposal. Shortly thereafter a binder was issued effective June 1, 1989.
Arkwright’s underwriting decisions concerning the proposal it made to Conagra were made by Jonathan Hall, an Arkwright regional underwriting manager and assistant vice president of the Midwest region. Mr. Hall’s office was located in Schaumberg. No Massachusetts personnel participated in the initial underwriting decision or proposal.
The binder itself was prepared in Arkwright’s Midwest regional office and was mailed directly to Conagra in Omaha. No activity concerning issuance of the binder took place within Massachusetts. After the binder was issued, however, employees of Arkwright in Schaumberg sent a copy of the binder together with instructions for assembling the policy to Arkwright’s home office in Waltham. The policy was assembled in Waltham by Arkwright’s policy production department and sent to Conagra in Omaha. In assembling the policy, the policy production department performed only a ministerial task and executed decisions made by Arkwright officials in Schaumberg.[1] Thereafter, all invoices for insurance premiums and all payment instructions were sent to Conagra by Arkwright from Massachusetts. Information concerning the Conagra account, wherever that information was generated, was stored on the main Arkwright computer in Waltham although Arkwright employees at the various regional Arkwright offices had access to that information just as handily as employees in Massachusetts.
With one major exception, the insurance Arkwright agreed to provide covered virtually all of Conagra’s property risks as well as those of its wholly owned subsidiaries. The exception was marine or ocean cargo coverage then provided by a different insurance company. Beginning in the late fall of 1989, however, Arkwright made a series of proposals to Conagra, and engaged in a series of meetings with Conagra, designed to persuade Conagra to shift its ocean marine coverage to Arkwright as well. All meetings took place in locations other than Massachusetts with the exception of a meeting that occurred in Waltham on November 29, 1989.
Arkwright’s marine-insurance proposal was successful and, effective January 1, 1990, Arkwright issued a binder that added marine and ocean cargo coverage to the Arkwright policy. Again, the binder was prepared in Schaumberg and sent to Conagra in Omaha although the policy production department in Waltham actually assembled the policy following directions from Schaumberg personnel.
As might be imagined with an insurance program of this magnitude, after the insurance became effective, Conagra personnel and Arkwright personnel had many discussions about the policy, its administration and claims made thereunder. None of those discussions involved Massachusetts personnel and no meetings concerning the policies ever took place in Massachusetts with the exception of the November 29, 1989 meeting held in the course of Arkwright’s effort to acquire Conagra’s ocean and marine risks.
For a time, Arkwright serviced the Conagra account from Arkwright’s Kansas Ciiy, Kansas district office. That practice ceased at some point and, when it did, all Conagra files Arkwright had generated were shipped to Conagra’s office in Schaumberg. Thereafter, the policies were serviced by Arkwright personnel in and from Schaumberg.
In August of 1990, Conagra acquired the Beatrice Company. At that time, Beatrice was insured by certain London insurers. After the acquisition, Conagra and Arkwright personnel held meetings in Omaha, Schaumberg and London to discuss the extent to which Arkwright would insure the risks generated by Conagra’s acquisition of Beatrice. None of those meetings was held in Massachusetts.
Ultimately, Conagra and Arkwright reached an agreement under which Arkwright would insure the Beatrice risks. Conagra alleges, however, that Arkwright never issued a policy containing all of the coverage terms. Indeed, Conagra alleges that, by the time of the losses here at issue, Conagra and Arkwright had exchanged a number of different sets of proposed policy terms but had not agreed upon any *366 set of terms that embodied in comprehensive fashion the insuring agreement they had made.
Insofar as the losses here at issue are concerned, the claimed absence of a document comprehensively embodying the insuring agreements between Arkwright and Conagra gives rises to a question whether the losses for which Conagra seeks recovery were in fact covered by the Arkwright policy. That issue arises because, as part of the negotiations between the parties concerning the terms under which Arkwright would provide insurance for the former Beatrice risks, Arkwright and Conagra discussed placement of certain portions of the Conagra risks with London underwriters. The risks under discussion were those, inter alia, associated with Conagra locations where the value of all property insured did not exceed 10 million, on average, during the twelve-month period preceding a given policy year.
The parties disagree on how firm negotiations concerning assignment of risks to London underwriters had become and on whether the two sides ever reached full agreement on the matter. Conagra contends that they did not reach full agreement and that, notwithstanding the absence of an agreement, Arkwright placed coverage for certain portions of the Conagra risk with London underwriters commencing June 1, 1991.
In any event, the two fires occurred, as stated, between June 1, 1991 and May 31, 1992 and it is for the consequences of those fires that Conagra seeks recovery here. The first fire occurred on December 28, 1991 in an underground cold storage facility operated by Americold Corporation in an abandoned limestone mine in Kansas City, Kansas. Conagra claims to have experienced losses of $28,872,290 in the course of that fire. The second fire occurred on March 16, 1992 in a cold storage facility owned and operated by United Refrigerated Services in Marshall, Missouri. Conagra claims that the losses it incurred during that fire amounted to $9,629,395.
After the fires occurred, Arkwright assigned adjusters from Factory Mutual Engineering Association (“Factory Mutual”) to investigate and adjust the losses. Factoiy Mutual, a corporation with a principal place of business in Norwood, Massachusetts, is owned by Arkwright and two other insurance companies. Factory Mutual performs a variety of services for those companies including adjustment of losses. Wayne Klocko, a senior Factory Mutual general adjuster whose office is in Norwood, was primarily responsible for adjusting the losses, although much of the investigation was coordinated in the Factory Mutual district office in Earth City, Missouri.
During the adjustment process, meetings occurred in the Midwest and correspondence was exchanged between Conagra, Arkwright and Factoiy Mutual offices in the Midwest. At Arkwright’s request, Conagra produced employees for examinations under oath in Omaha on October 20, 21, 22, and 23, 1992. Documents were produced in Omaha for Factoiy Mutual’s examination and all arrangements for production and examination occurred in Omaha or Minneapolis or both.
On October 29, 1992, Mr. Klocko sent a letter from his office in Norwood to Conagra in Omaha rejecting Conagra’s proofs of loss and setting forth his reasons for the rejection. In the main, those reasons centered on Mr. Klocko’s assertion that the proofs of loss contained inaccuracies as to the value of the goods lost or damaged and his assertion that the losses in fact were covered by policies London insurers, not Arkwright, had issued. At the end of his rejection letter, Mr. Klocko suggested that all parties meet to discuss the issues he had raised and all other issues underlying the Conagra claim.
A meeting of the type suggested by Mr. Klocko took place on January 27, 1993 in the New York City offices of Johnson and Higgins, a nation-wide insurance firm that was acting as Conagra’s claim consultant. No resolution of the dispute resulted from the meeting. This action thereafter was filed.
Although the Midwestern contacts between the parties are central to many of the issues this litigation raises, there is no question that there were many Massachusetts contacts as well. Arkwright, of course, is a Massachusetts corporation with its home office and principal place of business in Waltham. Factory Mutual maintains its principal place of business in Norwood. Arkwright sent invoices and payment instructions to Conagra from Massachusetts and Factory Mutual adjusted all Conagra claims under the Arkwright policies from its office in Norwood. Mr. Klocko, the factory Mutual adjuster principally responsible for losses resulting from the two fires, had his office at the Factory Mutual headquarters in Nor-wood and, so far as one can determine from the present record, conducted his analysis and evaluation of the Conagra claims from that office. Mr. Klocko’s sent his October 29, 1992 claim rejection letter from his office in Norwood to Conagra in Omaha.
III. DISCUSSION A. APPLICABLE LAW
G.L.c. 223A, §5 provides that
[w]hen the Court finds that in the interest of substantial justice the action should be heard in another forum, the Court may stay or dismiss the action in whole or in part on any conditions that may be just.
That statute embodies the common law doctrine of forum non conveniens, a discretionary device that allows the court to dismiss an action under certain circumstances even though both jurisdiction and venue are proper. To be sure, the doctrine is in practice rarely utilized, for unless the balance strongly favors some other forum, a plaintiffs choice of forum should *367 rarely be disturbed. Kearsarge Metallurgical Corp. v. Peerless Insurance Co., 383 Mass. 162, 169 (1981). Nevertheless a “decision whether to dismiss an action under the doctrine of forum non conveniens involves the discretion of the motion judge, cannot be made by applying a universal formula, and depends greatly on the specific facts of the proceeding before the Court.” W.R. Grace & Co. v. Hartford Accident & Indemnity Co., 407 Mass. 572, 577 (1990). The required factual focus involves consideration both of “private factors,” e.g., “the ease of access to proof, the availability of compulsory process, and the cost of attendance of witnesses,” id., as well as “(f]actors of public interest,” including “administrative burdens caused by litigation that has its origins elsewhere and the desirability of the trial of a case in a forum that is at home with the governing law.” id. See also Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947); New Amsterdam Casualty Co. v. Estes, 353 Mass. 90, 98-99 (1967).
B. APPLICATION OF GOVERNING LAW
When the principles just canvassed are applied to the facts of this case, I am of the opinion that, although the case is a close one and although substantial support exists for a different conclusion, the action should be dismissed on grounds of forum non conveniens.
Considering first the private factors, the factual narrative set out above reveals at least three principal points of contention between the parties to this litigation. The first concerns the nature of the agreement the parties made with respect to the policy terms. The second concerns whether, if the policy terms included an agreement that Arkwright could place with London underwriters risks at locations where the value of the property during a twelve month period did not exceed $10 million, the Americold and Marshall facilities met that criterion and thus whether Arkwright could deny coverage on grounds that it had properly placed the risks elsewhere. If the answer to that question is no or if the insuring agreement between Arkwright and Conagra did not give Arkwright the unilateral right to place certain portions of the Conagra risks with London underwriters, then the third issue centers on the value of Conagra’s losses in the two fires.[2]
It is clear, therefore, that the litigation’s center of gravity is in the Midwest. Almost everyone who can testify about the negotiations between Arkwright and Conagra lives and works in the Midwest. Virtually all of the correspondence exchanged during the negotiations originated at one Midwestern point and was directed to a second. If factual questions concerning the value of the Conagra products stored over time at the Americold and Marshall facilities are reached, it is clear not only that the relevant inventory records are in the Midwest but also that witnesses who may supplement those inventory records with their visual observations or private recordings are located there as well. Finally, all who can testify most handily about the value of Conagra’s loss as well as the salvage efforts and salvage value of the stored product are located in the Midwest.
Moreover, although no single Midwestern forum will have jurisdiction over all witnesses, access to proof, availability of compulsory process and access to trial are likely to be easier there than they would be in Massachusetts. As stated, significant activities took place and significant repositories of information exist in Schaumberg, Omaha and Marshall, Missouri and Kansas City, Kansas. Marshall and Kansas City are approximately 75 miles apart. Omaha is about 165 miles from Kansas City and about 200 miles from Marshall.[3] Schaumberg is about 400 miles from Omaha and from Kansas City. Prosecution of the action in any of those four states thus would substantially facilitate access to proof and to the trial and yield in the process substantial savings over the expenses attendant on the litigation’s progress in Cambridge.
Analysis of the public factors yields the same result. Clearly, this case will produce some administrative burdens for some court somewhere. Administrative burdens, however, attend every complex action and, in and of themselves, do not warrant dismissal. The kind of administrative burden this case is likely to impose on the court and parties if maintained in Massachusetts, however, is inconsistent with substantial justice. The claimed absence of a comprehensive written policy and the nature of other claims central to this litigation gives rise to a substantial likelihood that extensive discovery will be required in order to sort out conflicting testimony and recollections as to very fundamental but potentially very complex negotiations. Virtually all of that discovery will take place in the Midwest. Resolution of likely discovery problems thus will require this court to supervise events taking place largely in Midwestern offices involving Midwestern documents and Midwestern residents.
Moreover, no single state is the repository of all or even most of the information central to issues involving content of the policy terms, the historic value of Conagra goods stored at Kansas City or Marshall or the value of the fire losses. As a result, maintenance of the action here will likely result in substantial amounts of “long-range” supervision of discovery central to resolution of the case that is taking place more than 1000 miles away, much of it pursuant to compulsory process issued from and governed by distant courts. Of course, the multistate character of the case’s factual setting is likely to produce much out-of-state discovery no matter where the action is tried. A Midwestern setting for the trial will nonetheless greatly facilitate supervision of that discovery.
To be sure, Massachusetts is the forum at home with c. 93A and its common-law sibling, the covenant of good faith and fair dealing, see Anthony’s Pier Four, Inc. v. HBC Associates, Inc., 411 Mass. 451, 471 *368 (1991). Both, if not unique to Massachusetts, surely have a home-grown flavor.[4] Massachusetts courts are likely to be more familiar with the way in which decisional law has contoured c. 93A’s open text over the last two decades than are courts in distant jurisdictions.
In that regard, I reject Arkwright’s contention that Conagra’s claim under G.L.c. 93A must, on the present record, be dismissed. Count III of Conagra’s incorporates, inter alia, earlier allegations with respect to the manner in which Arkwright and Factory Mutual processed, and ultimately denied, Conagra’s claims and asserts that the claims-handling process and result was, for a variety of reasons, unfair and deceptive.[5] On the present record, there is, at the very least, a genuine issue of material fact concerning whether the allegedly unfair or deceptive claims-handling activities about which Conagra complains in Count III occurred in Massachusetts or at least were directed by Mr. Klocko as he performed his adjustment services from his Massachusetts headquarters.[6] If they did, then the question Count III raises is whether Massachusetts law applies to the Massachusetts action of a Massachusetts corporation headquartered in Massachusetts when the target of the alleged unfair and deceptive conduct was headquartered elsewhere. The answer to the question is fact-driven and must take into account not only where the actions had their impact but what Massachusetts activfly created that impact. See generally, Makino, U.S.A., Inc. v. Metlife Credit Corp., 25 Mass.App.Ct. 302 (1988). The ‘‘functional approach” commanded by the Court in Makino has both a qualitative and a quantitative aspect. See generally Gilleran, The Law of Chapter 93A §3:15 (1989). Accordingly, even when the “primarily and substantially” language of c. 93A, §11 is considered,[7] there are questions of fact about whether G.L.c. 93A applies to the conduct alleged in Count III of the Conagra complaint to the extent that Count III seeks recovery for acts or omissions during the claims-adjustment process.
The potential applicability of Chapter 93A to some of Arkwright’s conduct, however, does not change the overall mix. First, Arkwright’s potential liability under C. 93A jackets what is essentially a claim for breach of contract. The vast majority of the facts central to resolution of the breach of contract claim are within the knowledge of individuals, and recorded on documents, miles beyond the Massachusetts border. Second, Massachusetts discovery, while centrally important to Count III, involves a limited number of Massachusetts individuals, Mr. Klocko being chief among them. The prospect of a few depositions, however important, conducted here in connection with an action pending elsewhere presents no unusual or novel problems, administrative or other. Third, if and to the extent that unusual or novel problems do arise, a master already is in place, has familiarity with some aspects of these proceedings and could be appointed by the out-of-state court to continue performing the role he thus far has performed.[8] Finally, any unique questions concerning the application of G.L.c. 93A could be definitively and authoritatively resolved in the last analysis, by the Supreme Judicial Court under the provisions of S.J.C. Rule 1:03, §1, regardless of where the action was ultimately tried.
ORDER
In light of the foregoing, it is hereby ORDERED that
1. Arkwright’s Motion for Summaiy Judgment dismissing Count III of the Complaint should be, and it hereby is, DENIED and
2. Judgment enter dismissing the action on grounds of forum non conveniens. In view of the length of time that this motion has been pending and the possibility that dismissal after essential completion of Massachusetts discovery would be more helpful to overall progress of the action than dismissal now, however, entry of the Order of Dismissal is stayed pending a status conference to be held on April 3, 1995 at 2:45 p.m. to discuss the conditions under which, and the time at which, the Dismissal Order should actually enter.

To be sure, the parties do not agree that Arkwright ever issued a complete policy containing all of the terms they had agreed upon. I make no judgment one way or the other on that score but do find that the policy Arkwright sent to Conagra was assembled in the foregoing fashion.

To be sure, the litigation raises issues other than those just outlined but those three are the principal points of controversy.

Commencement of an action in federal court, although probably impossible, thus would likely provide a single court with jurisdiction over most of the Missouri, Kansas and Nebraska witnesses. See Fed.R.Civ.P. 45(b)(2)

From this vantage, it is not clear whether Massachusetts law or the law of some other jurisdiction ultimately will be found to control interpretation of the contracts. It is unlikely, however, that the contract law of any likely jurisdiction differs markedly from the contract law of any other. The likely similarity of contract law means that no “home court advantage” is produced by familiarity with the contract law of any particular jurisdiction where trial is possible.

On their face, the allegations of Count III incorporate all of the other allegations of the complaint. On the present record, though, it is unlikely that any of Arkwright’s acts or omissions before the losses occurred “primarily and substantially” in Massachusetts and thus give rise to a claim under c. 93A.

In so saying, I recognize that Mr. Klocko is an employee of Factory Mutual, not Arkwright. At the very least, however, Factory Mutual appears to have been acting as Arkwright’s agent for claims handling and the present record does not eliminate all genuine issues of material fact about whether Arkwright is responsible for Factory Mutual’s acts or omissions. Cf. Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 859-60 (1986).

See generally Bushkin Associates, Inc. v. Raytheon, Co., 393 Mass 622, 637 (1985); Makino, U.S.A., Inc. v. Metlife Capital Credit Corp., 25 Mass.App.Ct. 302, 308-09 (1988); Goldstein Oil Co. v. C.K. Smith Co., 20 Mass.App.Ct. 243, 244-45 (1985).

Alternatively, dismissal of the action could be stayed until the Massachusetts discovery was essentially concluded and then dismissal could be conditioned on the agreement of all parties as to use of the fruits of Massachusetts discovery wherever the action was tried.